# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NORTHUMBERLAND COUNTY RETIREMENT SYSTEM and OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>GMX RESOURCES INC., et al., )<br><br>Defendants. ) | Case No. CIV-11-520-D |

## PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CLASS ACTION COMPLAINT AND INCORPORATED BRIEF IN SUPPORT

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ............................................................................. 1

II.     STATEMENT OF FACTS .................................................................................... 3

III.    LEGAL STANDARDS ....................................................................................... 6

IV.     PLAINTIFFS HAVE ADEQUATELY PLED STANDING .................................. 8

        A.      Plaintiffs Have Pled Standing Under § 11 ..................................... 8

        B.      Plaintiffs Have Pled Standing Under § 12 ................................... 11

V.      GMX AND THE UNDERWRITER DEFENDANTS ARE
        "SELLERS" WITHIN THE MEANING OF § 12 ................................. 13

        A.      GMX is a Seller ................................................................... 15

        B.      The Underwriter Defendants are Sellers ..................................... 16

VI.     THE COMPLAINT ADEQUATELY PLEADS MATERIAL
        MISSTATEMENTS BY DEFENDANTS ............................................. 17

        A.      Defendants' Own Words Establish Falsity and Materiality ....................... 19

        B.      The Content of the Restated Financial Statements Further
                Establishes the Materiality of the Misstatements ....................... 22

                1.      The Subsequently Corrected Impairment Charges
                        Were Material ................................................................. 23

                2.      The Subsequently Removed DTAs Were Material ..................... 25

        C.      Material Weakness in Internal Controls ..................................... 28

VII.    DEFENDANTS FAIL TO ESTABLISH A NEGATIVE
        CAUSATION AFFIRMATIVE DEFENSE ............................................. 29

        A.      Any Decline in the Value of Shares is Presumed to be Caused
                by Defendants' Misstatements ................................................. 29

        B.      Defendants Do Not Prove Their Misstatements Did Not
                Cause the Decline in the Value of Shares ..................................... 30

C.   Defendants' Damages Argument is Premature, But Plaintiff is
Nonetheless Statutorily Entitled to Recover For Any Decline
in Share Value ............................................................................................ 33

VIII.   THE UNDERWRITER DEFENDANTS ARE LIABLE ..................................... 36

A.   The Underwriter Defendants Are Not Permitted to Rely on
Unaudited Financials ................................................................................... 37

B.   The Underwriter Defendants Ignored A Red Flag in the
Audited Financials ....................................................................................... 38

IX.   CONCLUSION .................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ................................................................... 36

*In re Alamosa Holdings, Inc.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ........................................................ 35

*In re Am. Bank Note Holographics Inc. Sec. Litig.*,
93 F. Supp. 2d 424 (S.D.N.Y. 2000)...................................................... 14, 16

*Amorosa v. Ernst & Young LLP*,
682 F. Supp. 2d 351 (S.D.N.Y. 2010)......................................................... 35

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................... 19

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 6

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
07 CIV. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ..................... 35

*Cent. Laborers' Pension Fund v. SIRVA, Inc.*,
No. 04-CV-7644, 2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) ................ 28

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009) ................................................................ 30

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
701 F. Supp. 2d 506 (S.D.N.Y. 2010)......................................................... 14

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................... 31

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
8:04-CV-2561, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ...................... 35

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).......................... 35

*In re Dynegy, Inc. Sec. Litig.*,
   226 F.R.D. 263 (S.D. Tex. 2005) .................................................................. 29, 31, 33

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) .......................................................................... 18, 24

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   MDL-1446, 2005 WL 3704688 (S.D. Tex. Dec. 5, 2005) ................................ 37, 38

*Feiner v. SS&C Techs., Inc.*,
   47 F. Supp. 2d 250 (D. Conn. 1999) ......................................................................... 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   411 F. Supp. 2d 377 (S.D.N.Y. 2006) ....................................................................... 32

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
   CIV-A-503-MD-1530, 2004 WL 5278716 (E.D. Tex. June 16, 2004) ...................... 38

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ................................................................... 17, 24, 25

*In re Gen. Elec. Co. Sec. Litig.*,
   856 F. Supp. 2d 645 (S.D.N.Y. 2012) ...................................................................... 27

*Genesee Cnty. Emps' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*,
   825 F. Supp. 2d 1082 (D.N.M. 2011) ................................................................ 31, 35

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ............................................................. 17, 23, 26

*In re H & R Block Sec. Litig.*,
   527 F. Supp. 2d 922 (W.D. Mo. 2007) .................................................................... 19

*Herman & MacLean v. Huddleston*,
   459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) ......................................... 7, 21

*Hoff v. Popular, Inc.*,
   727 F. Supp. 2d 77 (D.P.R. 2010) .......................................................................... 25

*Joseph v. Wiles*,
   223 F.3d 1155 (10th Cir. 2000) ............................................................................... 8

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) .................................................................................. 32

*Litwin v. Blackstone Grp., L.P.*,
     634 F.3d 706 (2d Cir. 2011) ................................................................ 18

*Maher v. Durango Metals, Inc.*,
     144 F.3d 1302 (10th Cir. 1998) .......................................................... 14

*Mallen v. Alphatec Holdings, Inc.*,
     861 F. Supp. 2d 1111 (S.D. Cal. 2012) ............................................... 14

*In re McKesson HBOC, Inc. Sec. Litig.*,
     126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................... 36

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
     272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................. 36

*In re Mun. Mortg. & Equity, LLC*,
     No. MJG-08-1961-MDL, 2012 U.S. Dist. LEXIS 88339
     (D. Md. June 25, 2012) ........................................................................ 10

*In re New Century*,
     588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................... 28

*In re Numerex Corp. Sec. Litig.*,
     913 F. Supp. 391 (E.D. Pa. 1996) ....................................................... 10

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
     838 F. Supp. 2d 1148 (D. Colo. 2012) ................................................ 14

*Pinter v. Dahl*,
     486 U.S. 622 (1988) ............................................................... 14, 15, 16

*Robbins v. Oklahoma*,
     519 F.3d 1242 (10th Cir. 2008) ............................................................ 6

*Schaffer v. Evolving Sys., Inc.*,
     29 F. Supp. 2d 1213 (D. Colo. 1998) ................................................. 31

*Schwartz v. Celestial Seasonings*,
     178 F.R.D. 545 (D. Colo. 1998) .......................................................... 10

*In re Scottish Re Grp. Sec. Litig.*,
     524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................. 25

*In re SemGroup Energy Partners, L.P.*,
     729 F. Supp. 2d 1276 (N.D. Okla. 2010) ..................................... passim

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ............................................................. 10, 11

*In re Shoretel, Inc., Sec. Litig.*,
  C-08-00271, 2009 WL 2588881 (N.D. Cal. Aug. 19, 2009) ................................. 30, 34

*In re Software Toolworks. Inc. Sec. Litig.*,
  50 F.3d 615 (9th Cir. 1994) ............................................................. 40

*In re Stratosphere Corp. Sec. Litig.*,
  1 F. Supp. 2d 1096 (D. Nev. 1998) ....................................................... 10

*In re The Warnaco Grp., Inc. Sec. Litig. (II)*,
  388 F. Supp. 2d 307 (S.D.N.Y. 2005) ..................................................... 18

*United Food & Commercial Workers Union v. Chesapeake Energy Corp.*,
  281 F.R.D. 641 (W.D. Okla. 2012) ....................................................... 9, 12

*United Food and Commercial Workers Union v. Chesapeake Energy Corp.*,
  No. 09-CIV-1114, 2010 WL 3527596 (W.D. Okla. Sept. 2, 2010) ..................... passim

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ..................................................... 10

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
  259 F.R.D. 490 (W.D. Wash. 2009) ....................................................... 31

*In re WebSecure Sec. Litig.*,
  182 F.R.D. 364 (D. Mass. 1998) ......................................................... 10

*In re Worldcom, Inc. Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ........................................... 31, 37, 38, 39

*In re WRT Energy Sec. Litig.*,
  96-CIV-3610, 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) ................. 29, 30, 32, 35

**STATUTES**

15 U.S.C. § 77k(b)(3)(C) ................................................................... 37

15 U.S.C. § 77k(e) ..................................................................... 34, 36

15 U.S.C. § 77*l* ........................................................................ 34

15 U.S.C. § 77*l*(a)(2) .................................................................. 13

15 U.S.C. § 77z-1(a)(3)(B) ............................................................................................ 1

15 U.S.C. § 78u-4(b)(3)(B) ........................................................................................ 10

15 U.S.C.A. § 77o......................................................................................................... 7

**OTHER AUTHORITIES**

17 C.F.R. § 210.1-2(a)(4) ........................................................................................... 20

17 C.F.R. § 230.159A(a) ................................................................................. 13, 14, 15

*Accounting Changes and Error Corrections*,
    Statement of Fin. Accounting Standards No. 154.................................................. 21, 22

*Accounting for Income Taxes*,
    Statement of Fin. Accounting Standards No. 109........................................... 25, 26, 27

*Amendments to Rules Regarding Mgmt.'s Report*
    *on Internal Controls Over Fin. Reporting*,
    Securities Act Release No. 76, 2007 WL 1790874 (June 27, 2007) .......................... 20

*Mgmt.'s Report on Internal Control Over Fin. Reporting*,
    Securities Act Release No. 8762, 2006 WL 3740310 (Dec. 20, 2006) ...................... 19

*Securities Offering Reform*,
    Securities Act Release No. 75, 2005 WL 1692642 (July 19, 2005) ........................... 13

Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, (1999)............................ 18, 23, 24

## I.     PRELIMINARY STATEMENT

The Amended Class Action Complaint ("Complaint") asserts claims against Defendant GMX Resources, Inc. ("GMX" or the "Company"), the Individual Defendants,[1] the Underwriter Defendants,[2] and Smith, Carney & Co., P.C. ("Smith Carney")[3] for violations of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of Lead Plaintiffs[4] and those who purchased GMX common stock in or traceable to the May 13, 2009 offering (the "May 2009 Offering") and the October 22, 2009 offering (the "October 2009 Offering") and who were damaged thereby (the "Class").

On March 11, 2010, GMX restated its full year 2008 financial statements as well as its financial statements for the first three quarters of 2009 (the "Restatement"), thus conceding that the offering materials for **both** the May 2009 Offering and the October

---

[1] "Individual Defendants" refers to: Ken L. Kenworthy Jr. ("Kenworthy"), who was, at all relevant times, the Company's President, Chief Executive Officer ("CEO") and Chairman of the Board of Directors; and James A. Merrill ("Merrill"), who was, at all relevant times, the Company's Chief Financial Officer ("CFO").

[2] "Underwriter Defendants" refers to: Jefferies & Company, Inc. ("Jefferies"), Howard Weil Incorporated ("Howard Weil"), Capital One Suncoast, Inc. ("Capital One"), Pritchard Capital Partners, LLC ("Pritchard"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), BBVA Securities Inc. ("BBVA"), Fortis Securities LLC ("Fortis"), Wedbush Morgan Securities Inc. ("Wedbush Morgan"), and Credit Suisse Securities (USA) LLC ("Credit Suisse").

[3] Smith Carney, together with GMX, the Individual Defendants and the Underwriter Defendants are collectively referred to herein as "Defendants."

[4] On July 3, 2012, the Court appointed Northumberland County Retirement System ("Northumberland") and Oklahoma Law Enforcement Retirement System ("OLERS") as Lead Plaintiffs in this action pursuant to Section 15 U.S.C. § 77z-1(a)(3)(B) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* Dkt. No. 94.

2009 Offering (collectively, the "Offerings"), which incorporated those financial statements, contained untrue statements when they were issued.   The Restatement revealed that:   (1) GMX had improperly accounted for full cost pool impairment and other impairment charges; (2) GMX had incorrectly accounted for deferred income taxes; (3) GMX's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and (4) GMX lacked adequate internal controls. ¶ 10.[5]   In addition to announcing the Restatement, the Company cautioned, with respect to its 2008 year-end and 2009 quarterly financial statements, that "**such financial statements should no longer be relied upon**" and further stated in GMX's March 16, 2010 Form 10-K that "**a material weakness** exists in our internal control over financial reporting related to the improper application of [GAAP]."  ¶¶ 47, 52.

Incredibly, against the backdrop of GMX's Restatement, acknowledgement that these financial statements should not be relied upon and admission of a material weakness in the Company's internal controls, Defendants now assert that Plaintiffs have failed to plead any material misstatements in the Offering Materials (defined below). Defendants also contend that Plaintiffs lack standing to pursue §§ 11 and 12 claims related to the May 2009 Offering, that Defendants were not sellers within the meaning of § 12, and that Plaintiffs have failed to plead loss causation.   Finally, the Underwriter Defendants claim that they were entitled to rely on the financial statements.  As discussed herein, all of Defendants' arguments are without merit.

---

[5] "¶ __" refers to paragraphs in the Complaint (Dkt. No. 114).  All emphasis is added and all internal citations and quotations are omitted unless otherwise noted.

Indeed, Plaintiffs have sufficiently alleged that Defendants made untrue statements of material fact through the improper application of accounting principles in recording its full cost pool impairment and other impairment charges, as well as the Company's deferred income taxes assets ("DTAs") and by falsely stating that GMX had adequate internal controls over financial reporting when, in actuality, the Company was suffering, in its own words, from a "material weakness" in its internal controls.  ¶¶ 38, 44, 52. Plaintiffs also have adequately alleged that they purchased securities in or traceable to the Offerings and that Defendants were statutory sellers within the meaning of § 12.  Nothing more is required.

Moreover, the Underwriter Defendants were not entitled to rely on the financial statements as they were either unaudited or contained red flags that should have put them on notice of possible inaccuracies in the audited financials.  Smith Carney's defenses are off base and not applicable to a Securities Act claim.[6]  Accordingly, Defendants' motions to dismiss should be denied in their entirety.

## II.   STATEMENT OF FACTS

GMX is a "pure play" independent oil and natural gas exploration and production company, meaning that materially all of the Company's business is devoted to drilling for and producing oil and natural gas in one core area.  ¶¶ 2, 32.  GMX focuses on the development of unconventional Haynesville/Bossier Shale and Cotton Valley Sands in

---

[6] Responses to these specific defenses are set forth in Plaintiffs' Opposition to Smith Carney's Motion to Dismiss the Amended Class Action Complaint and Incorporated Brief in Support which is filed simultaneously with this brief.

the Sabine Uplift of the Carthage, North Field of Harrison and Panola counties of East Texas. *Id*.

GMX completed an equity offering on May 13, 2009 in which the Company sold 5,750,000 shares of GMX common stock to investors at a price of $12.00 per share, resulting in gross proceeds of $69,000,000.  ¶ 34.  In connection with the May 2009 Offering, GMX filed a Prospectus with the Securities Exchange Commission ("SEC") on June 25, 2008 and filed a Prospectus Supplement with the SEC on May 14, 2009 (dated May 13, 2009) (collectively, the "May 2009 Offering Materials").  ¶¶ 5, 34.  The underwriters for the May 2009 Offering were Merrill Lynch, Jefferies, Capital One, BBVA, Fortis and Wedbush Morgan.  ¶ 35.  The May 2009 Offering Materials incorporated by reference certain information, including the Company's 2007 Annual Report, which was filed with the SEC on March 14, 2008 and signed by the Individual Defendants, and its consolidated financial statements as of December 31, 2007 and 2008 and for the years ended December 31, 2006, 2007 and 2008. ¶¶ 36, 37.  The May 2009 Offering Materials also included summary financial data for, *inter alia*, the first quarter of 2009. ¶ 39.

GMX then completed a second equity offering on October 22, 2009 in which it sold 6,950,000 shares of GMX stock to investors at a price of $15.00, resulting in gross proceeds of $104,250,000.  ¶ 40.  In connection with the October 2009 Offering, the Company filed a Prospectus with the SEC on June 25, 2008 and filed a Prospectus Supplement with the SEC on October 26, 2009 (dated October 22, 2009) (the "October 2009 Offering Materials" and together with the May 2009 Offering Materials, the

"Offering Materials").   *Id*.   The October 2009 Offering Materials incorporated by reference certain information, including the Company's 2007 and 2008 Annual Reports, which were filed with the SEC and signed by the Individual Defendants, and its consolidated financial statements as of December 31, 2007 and 2008 and for the years ended December 31, 2006, 2007 and 2008.   ¶¶ 42, 43.   The October 2009 Offering Materials also included financial information for, *inter alia*, the year ended December 31, 2008 and the first two quarters of 2009.   ¶ 45.   In addition, the Offering Materials for both Offerings contained language stating that the Company had evaluated its internal controls over financial reporting and had not identified any control deficiencies.   ¶¶ 38, 44.

As evidenced by GMX's subsequent Restatement, the Offering Materials contained material misstatements regarding the accuracy and integrity of the Company's financial statements, as well as the adequacy of the Company's internal control over financial reporting.   On March 11, 2010, the Company restated its full year 2008 financial statements and the financial statements for the first three quarters of 2009, thereby admitting that the statements in the Offering Materials were untrue when they were issued.   ¶ 47.   In announcing the Restatement, the Company cautioned, with respect to the 2008 year-end and 2009 quarterly financial statements that "**such financial statements should no longer be relied upon**."   ¶ 47.

As GMX further explained in March 2010, "the Company's restated net loss for the year ended December 31, 2008 was $124.6 million as compared to the originally reported $81.7 million."   ¶ 47.   The corrections revealed by the Restatement also, *inter*

*alia*, increased the impairment of oil and natural gas properties by $41,021,000 for the three months ended December 31, 2008 while decreasing the impairment of oil and natural gas properties by $45,650,000 for the three months ended March 31, 2009, and completely removed the DTAs from the Company's December 31, 2008, March 31, 2009, June 20, 2009, and September 30, 2009 balance sheets.  ¶¶ 48, 55.

GMX's March 16, 2010 Form 10-K also disclosed that the Company had "***identified a material weakness in our internal control over financial reporting due to management's improper application of [GAAP]***" and that "***[m]anagement failed to timely detect and correct errors relating to the improper application of [GAAP].***"  ¶ 52. As a result of Defendants' untrue statements and omissions of material fact, Defendants have violated the Securities Act and Plaintiffs and the Class have suffered losses.  ¶ 11.

## III.   LEGAL STANDARDS

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plaintiffs' "allegations must be enough that, if assumed to be true, the plaintiff plausibly . . . has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).  For the purposes of deciding a motion to dismiss, a court "must construe well-pleaded facts as true." *United Food and Commercial Workers Union v. Chesapeake Energy Corp.*, No. 09-CIV-1114 (DeGiusti, J.), 2010 WL 3527596, at *3 (W.D. Okla. Sept. 2, 2010).  Dismissal of a securities claim on a 12(b)(6) motion is "difficult to obtain because the cause of action

deals primarily with fact-specific inquiries such as materiality." *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1286 (N.D. Okla. 2010).

Section 11 of the Securities Act imposes strict liability against the issuer of securities where a registration statement contains material misstatements or omits material facts. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983). Under § 11, "[i]f a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Id.* at 382. Section 11 "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id.*

Section 12(a)(2) liability mirrors that of § 11 but instead "applies to alleged material misstatements or omissions in a prospectus rather than in a registration statement." *United Food*, 2010 WL 3527596, at *4. In addition, § 12(a)(2) liability extends only to "statutory sellers." *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 643-47 (1988)). Therefore, to state a claim under § 12(a)(2):

> [A] plaintiff must plead facts to show 1) the defendant is a statutory seller;
> 2) the sale was effectuated by means of a prospectus or oral
> communication; and 3) the prospectus or oral communication include[d] an
> untrue statement of a material fact or omit[ted] to state a material fact
> necessary in order to make the statements, in the light of the circumstances
> under which they were made, not misleading.

*Id.*

To state a claim under § 15 "for controlling person liability, [a] plaintiff must allege a primary violation of the underlying federal securities statute and 'control' by the alleged controlling person." *In re SemGroup*, 729 F. Supp. 2d at 1307; *see also*

15 U.S.C.A. § 77o ("Every person who . . . controls any person liable under [§§ 77k or 77*l*] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable").

## IV.   PLAINTIFFS HAVE ADEQUATELY PLED STANDING

Defendants argue that the Complaint should be dismissed for failure to plead standing under §§ 11 and 12 of the Securities Act.  GMX Br. at 10-14.[7]  However, Defendants' argument attempts to impose a higher pleading standard than is required, and improperly asks this Court to decide the merits of Plaintiffs' claims prematurely. Plaintiffs have sufficiently pled standing at this juncture, and therefore, the Court should reject Defendants' arguments.

### A.   Plaintiffs Have Pled Standing Under § 11

Defendants contend that Plaintiffs lack standing under § 11 to assert claims related to the May 2009 Offering.  GMX Br. at 10-13.  However, Defendants' arguments must fail because Plaintiffs have sufficiently pled standing under § 11.  "Section 11 provides that where a material fact is misstated or omitted from a registration statement accompanying a stock filing with the SEC, '*any person acquiring such security*' may bring an action for losses caused by the misstatement or omission." *Joseph v. Wiles*, 223 F.3d 1155, 1158 (10th Cir. 2000) (quoting 15 U.S.C. 77k(a)).  The phrase "any person acquiring such security" includes (1) direct purchasers who acquired securities directly in the subject offering *and* (2) aftermarket purchasers who can "trace" their

---

[7] "GMX Br. at __" refers to pages in the Motion to Dismiss the Amended Complaint and Brief in Support of Defendants GMX Resources, Inc., Ken L. Kenworthy, Jr., and James A. Merrill (Dkt. No. 115).

securities to the offering.  *Id.* at 1159.  Thus, as this Court has explained, "[t]o state a claim for relief under § 11, a plaintiff must allege [that] he purchased a registered security, either directly from the issuer or in the aftermarket following the offering." *United Food*, 2010 WL 3527596, at *4.

Defendants' Motion to Dismiss specifically challenges Plaintiffs' ability to trace their securities to one of the Offerings at issue—the May 2009 Offering.[8]  However, Plaintiffs are not required to *prove* traceability at this stage of the litigation.  In fact, Plaintiffs are not required to prove traceability until at least some point **after** class certification.  Indeed, when faced with this issue in the context of a class certification motion, this Court held, "[t]he issue of tracing is a merits issue, not appropriate for consideration at the class certification stage."  *United Food & Commercial Workers Union v. Chesapeake Energy Corp.*, 281 F.R.D. 641, 656 (W.D. Okla. 2012).  The Court went on to conclude:

> The Court agrees with those courts considering this issue in the context of the Rule 23(b) predominance requirements that the issue of tracing does not preclude certification of a class action in all cases, and consideration of the tracing difficulties of some potential class members **involves an assessment of the merits of their claims**, a consideration which is not properly addressed at the certification stage.

*Id*. at 657.  Thus, if tracing is a merits issue that should not even be addressed at the class certification stage, it certainly should not be addressed at the motion to dismiss stage.

---

[8] Defendants' § 11 standing challenge is limited to the May 2009 Offering only.  *See* GMX Br. at 10.

Instead, all Plaintiffs must do at this early stage of the litigation is "allege" that their shares are traceable to a false or misleading registration statement. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 286 (3d Cir. 1992); *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) ("The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement.").[9]   For the purposes of a motion to dismiss, the court "*assume[s]* that plaintiffs' shares . . . can be sufficiently traced to the prospectus." *In re Numerex Corp. Sec. Litig.*, 913 F. Supp. 391, 395 n.4 (E.D. Pa. 1996); *see also Schwartz v. Celestial Seasonings*, 178 F.R.D. 545, 556 (D. Colo. 1998). Plaintiffs have alleged traceability sufficient to confer standing under § 11.   ¶ 5.   Yet, Defendants attempt to hold Plaintiffs to a higher pleading standing than is required. However, because Plaintiffs' claims are not premised on fraud, the heightened pleading standard under Rule 9(b) is not triggered. *See United Food*, 2010 WL 3527596, at \*4. As such, Plaintiffs have sufficiently alleged standing under § 11.

Moreover, Defendants' argument is premature in light of the fact that Plaintiffs are not permitted to conduct discovery at this stage of the litigation.  *See* 15 U.S.C. § 78u-4(b)(3)(B) ("all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss").   Thus, it is virtually impossible for Plaintiffs to obtain the

---

[9] *See also In re Mun. Mortg. & Equity, LLC*, No. MJG-08-1961-MDL, 2012 U.S. Dist. LEXIS 88339, at \*106 (D. Md. June 25, 2012); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1119 (D. Nev. 1998) (assertion that plaintiffs' "shares can be traced to the Stock Offering" was sufficient to overcome motion to dismiss based on standing); *In re WebSecure Sec. Litig.*, 182 F.R.D. 364, 367 (D. Mass. 1998) (allegation that plaintiffs purchased stock "pursuant to or traceable to" the defective registration statement satisfied the pleading requirement for standing).

documents needed to establish the exact source and chain of custody of their shares.  *See Shapiro*, 964 F.2d at 286 ("Before discovery takes place . . . it is impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market.").

In sum, the Complaint contains allegations that Plaintiffs purchased GMX securities either directly in or traceable to the May 2009 Offering.  ¶ 5.  These allegations are sufficient to establish § 11 standing.

### B.  Plaintiffs Have Pled Standing Under § 12

Defendants next argue that neither Lead Plaintiff has standing under § 12 for the May 2009 Offering because they did not purchase GMX shares directly in the Offering. GMX Br. at 13-14.  In support of this argument, Defendants contend that tracing is not a permitted means of establishing standing under § 12.  *Id*. at 13.  This argument fails because tracing is in fact allowed under § 12.  Indeed, "§ 12(a)(2) extends to aftermarket trading of a publicly offered security, so long as that aftermarket trading occurs 'by means of a prospectus or oral communication.'"  *Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250, 253 (D. Conn. 1999) (quoting 15 U.S.C. § 77*l*).  The period for sales "by means of a prospectus" extends beyond the initial distribution because the registration framework requires delivery of a prospectus for a fixed number of days after the registration statement becomes effective (the effective period), even if the initial distribution has been completed.  *Id.* (citing 15 U.S.C. §§ 77d-e; 17 C.F.R. § 230.174(d)).  Thus, "§ 12(a)(2) liability is coextensive with the statutory and regulatory prospectus-delivery requirements."  *Id.*

Here, GMX issued a Prospectus Supplement on May 13, 2009—the date of the Offering.  Plaintiff OLERS purchased GMX shares on May 21 and 22, 2009—just eight and nine days later.  Plaintiff Northumberland purchased GMX shares on June 22, 2009—exactly forty days after the Offering.  Because both Plaintiffs purchased GMX shared within the effective period of the Prospectus Supplement, they have standing to bring their § 12 claims.

In any event, this Court has held that, while aftermarket purchasers may not be able to *recover* under § 12, "they may properly be included in a class because common questions remain predominant over individual questions."  *United Food*, 281 F.R.D. at 659.  Therefore, the Court concluded that a single class definition should be used for both §§ 11 and 12 claims—including those who purchased directly or indirectly in the offerings—because "[t]he issue is one of recoverable damages rather than class definition."  *Id.*

The same rationale applies here.  Even if it were true that Plaintiffs may not ultimately recover on their § 12 claim with respect to the May 2009 Offering, they are entitled to, at the very least, pursue this claim on behalf of themselves and all others who purchased either directly or indirectly in the Offerings.  *Id.*

## V.    GMX AND THE UNDERWRITER DEFENDANTS ARE "SELLERS" WITHIN THE MEANING OF § 12

Defendants argue that Plaintiffs' § 12 claim should be dismissed because Plaintiffs fail to allege who sold them the GMX stock.  GMX Br. at 23-24.[10]  This argument fails because it (1) is foreclosed as to GMX by the statutory definition of "seller," (2) is contrary to controlling case law, including a recent decision by this Court, and (3) ignores the allegations contained in the Complaint.

Section 12(a)(2) creates liability for any person who "offers or sells" newly-issued securities "by means of a prospectus or oral communications."  15 U.S.C. § 77$l$(a)(2). The term "seller" within the meaning of § 12 is defined both by statute and by case law.

*First*, SEC Rule 159A defines "seller" as follows:

> For purposes of section 12(a)(2) of the Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, ***seller shall include the issuer of the securities*** sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any of the following communications:

> (1) Any preliminary prospectus or prospectus of the issuer relating to the offering required to be filed pursuant to Rule 424 (§ 230.424) or Rule 497 (§ 230.497) . . . .

17 C.F.R. § 230.159A(a).  According to the SEC, an ***issuer*** qualifies as a statutory seller because by "offering or selling its securities in a registered offering pursuant to a

---

[10] This argument appears to be restated—*word for word*—from GMX's original Motion to Dismiss filed on June 20, 2011.  *See* Dkt. No. 58 at pp. 24-25.  In both Motions, the only authority cited in support of the Defendants' argument is this Court's decision in *United Food*, 2010 WL 3527596.  However, as demonstrated herein, in *United Food*, this Court **upheld** the plaintiffs' § 12 claims.  *Id.*  Accordingly, the Defendants have failed to cite a single case that supports their position.

registration statement containing a prospectus that it has prepared and filed," the **issuer** "can be viewed as soliciting purchases of the issuer's registered securities." *Securities Offering Reform*, Securities Act Release No. 75, 2005 WL 1692642, at *78 (July 19, 2005) (citing *Pinter v. Dahl*, 486 U.S. 622 (1988)).

Courts routinely apply this statutory definition in holding issuers liable under § 12. *See, e.g., In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1179 (D. Colo. 2012) ("With regard to the Funds themselves, the argument is foreclosed as a matter of logic and by SEC Rule 159A, providing that issuers of securities are statutory sellers for purposes of § 12(a)(2)."); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1132 (S.D. Cal. 2012) (finding issuer of securities to be a "seller" within the meaning of § 12 based on Rule 159A); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (same).

*Second*, the U.S. Supreme Court also has defined seller as the "owner who passed title, or other interest in the security, to the buyer for value," **or** a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 642, 647;[11] *see also United Food*, 2010 WL 3527596, at *4. Importantly, a seller is "not limited to those who pass title." *Pinter*, 486 U.S. at 643; *see also United Food*, 2010 WL 3527596, at *7.

---

[11] The *Pinter* decision addressed the statutory meaning of "seller" under what was then Section 12(1) and is now § 12(a)(1). However, the Tenth Circuit and other courts have acknowledged the *Pinter* definition of a statutory seller under § 12(a)(1) "applie[s] to § 12(a)(2) as well." *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1307 n.10 (10th Cir. 1998); *see also In re Am. Bank Note Holographics Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 438 (S.D.N.Y. 2000).

Plaintiffs assert a § 12 claim against GMX and the Underwriter Defendants.  *See* ¶¶ 74-77.  GMX and the Underwriter Defendants meet either (or both) of the foregoing definitions of "seller" within the meaning of § 12.

## A.   GMX is a Seller

It is undisputed that GMX is the registrant and issuer of the GMX securities at issue.  *See* GMX Br. at 5 ("Both offerings were made pursuant to GMX's Form S-3 registration statement filed on April 21, 2008.").  Therefore, GMX is a seller under SEC Rule 159A, which, as set forth above, imposes § 12(a)(2) liability on the issuer of the securities sold pursuant to a prospectus.  17 C.F.R. § 230.159A(a).

Moreover, GMX cannot deflect liability based on the fact that the Offerings were firm commitment offerings—"*i.e.*, the Underwriter Defendants purchased shares from the Company and then sold them to the public" (GMX Br. at 24)—because SEC Rule 159A defines issuers as sellers "***regardless of the underwriting method*** used to sell the issuer's securities."  17 C.F.R. § 230.159A(a).

GMX also meets the definition of "seller" under *Pinter*.  While GMX may not have passed title directly to Plaintiffs, there is no doubt that GMX successfully solicited the purchase, "motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Pinter*, 486 U.S. at 647.  "Solicitation" for purposes of § 12(a)(2) potential liability "includes both personal solicitation and substantial involvement in the offering process."  *United Food*, 2010 WL 3527596, at *7.  Even without ever owning the shares or signing a registration statement, a defendant can be a statutory seller where it actively solicited the sale of the securities through, for example,

"participation in preparation of the registration statement and prospectus and in road shows, with a motivation to serve [its] own financial interests or those of the securities' owner." *In re Am. Bank Note Holographics*, 93 F. Supp. 2d at 439.

Here, just as in *United Food*, Plaintiffs have alleged facts showing that GMX was involved in all stages of the Offerings. *See supra,* Section II herein; *see United Food*, 2010 WL 3527596, at *7. These allegations are sufficiently detailed to present a plausible claim for relief against GMX under § 12(a)(2).

### B.    The Underwriter Defendants are Sellers[12]

The Underwriter Defendants also meet the definition of "seller" within the meaning of § 12. As GMX points out, the Offerings were "firm commitment offerings," meaning that the Underwriter Defendants purchased shares from the Company and then sold them to the public. GMX Br. at 24. "In a firm commitment underwriting, the underwriter is the *owner* of whatever shares fail to sell in the public offering." *Am. Bank Note Holographics*, 93 F. Supp. 2d at 439 (emphasis in original). "A direct sale to public investors makes an underwriter a 'seller' within the meaning of Section 12(a)(2) under the first prong of the *Pinter* test." *Id.* In other words, the Underwriter Defendants necessarily "passed title, or other interest in the security" to Plaintiffs for value. *Pinter*, 486 U.S. at 642.

---

[12] Although the Underwriter Defendants purport to "join and incorporate by reference . . . all of the arguments for dismissal" made by GMX, Kenworthy and Merrill (*see* Underwriter Defendants' Motion to Dismiss the Amended Complaint and Incorporated Brief In Support (Dkt. No. 117) at 1 [hereinafter "U/W Br. at __"]), the Underwriter Defendants assert no additional or independent arguments regarding Plaintiffs' § 12 claim.

Moreover, the Complaint contains detailed allegations regarding which Underwriter Defendants underwrote each Offering. *See* ¶¶ 35, 41, 75. Accordingly, the Underwriter Defendants are "sellers" for purposes of § 12.

## VI.   THE COMPLAINT ADEQUATELY PLEADS MATERIAL MISSTATEMENTS BY DEFENDANTS

Defendants assert that the Complaint fails to identify any material misstatements in the Offering Materials. This contention is erroneous because, as discussed below, Defendants' own characterization of the Restatement and the content of the Restatement establish the materiality of the false and misleading statements contained in the financials. In pleading a § 11 claim, and similarly a § 12(a)(2) claim, the materiality requirement poses a very low burden; "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). A statement or omission is material if "a reasonable investor would consider it important in determining whether to buy or sell stock." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997); *see also United Food*, 2010 WL 3527596, at *6. Materiality "may be characterized as a mixed question of law and fact and the determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id*. at *6. As mentioned

above, due to the fact-specific nature of the materiality inquiry, this determination is

rarely appropriate on a motion to dismiss. *See supra* Section III.[13]

    To evaluate the materiality of alleged misstatements, a court should consider

quantitative factors, such as the size of the restated items, as well as qualitative factors.

The SEC's Staff Accounting Bulletin No. 99 ("SAB No. 99"), adopted by the Second

Circuit as a persuasive guide in evaluating the materiality of an alleged

misrepresentation, provides illustrative qualitative factors to apply in a materiality

analysis.[14]   In this bulletin, the SEC stated "[q]ualitative factors may cause misstatements

of quantitatively small amounts to be material," and included among the listed factors to

consider, "[w]hether the misstatement masks a change in earnings or other trends" and

"[w]hether the misstatement concerns a segment or other portion of the registrant's

business that has been identified as playing a significant role in the registrant's operations

or profitability."  SAB No. 99, 64 Fed. Reg. 45150, 45152 (1999).

    Defendants disingenuously argue that the Restatement was not material.  This

argument is without merit.  Indeed, when the above framework is applied to Defendants'

misstatements and omissions set forth in the Complaint, it is clear Plaintiffs have

---

[13] *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) *cert. denied*, 132 S. Ct. 242, 181 L. Ed. 2d 138 (U.S. 2011) ("Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower."); *In re The Warnaco Grp., Inc. Sec. Litig. (II)*, 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005) *aff'd sub nom., Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) (stating that the question of materiality is a mixed question of law and fact generally inappropriate for determination at the pleading stage).

[14] *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("This Court has deemed SAB No. 99 to be persuasive authority.").

adequately alleged that the Offering Materials contained false and misleading statements and omissions of material fact.

### A. Defendants' Own Words Establish Falsity and Materiality

As several district courts have held, "[a]lthough a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is [a] sufficient basis for pleading that those statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004); *see also In re H & R Block Sec. Litig.*, 527 F. Supp. 2d 922, 928 (W.D. Mo. 2007) ("Plaintiff has adequately pled that the financial statements preceding the announced Restatement were false."). The Offering Materials, when they were issued, contained material misstatements and omissions regarding, *inter alia*, GMX's financial performance and the adequacy of the Company's internal controls.

Moreover, rather than simply restating the financial statements for the applicable period, GMX warned investors that "[b]ased on the errors in the 2008 year-end and 2009 quarterly financial statements . . . such financial statements *should no longer be relied upon* . . . ." and further stated in GMX's March 16, 2010 Form 10-K, "we identified a *material weakness in our internal control over financial reporting* . . . ." ¶¶ 47, 52.[15] The "material weakness" terminology, chosen by the Company, is used to indicate "a

---

[15] As stated by the SEC, "the restatement of financial statements does not, by itself, necessitate that management consider the effect of the restatement on the company's prior conclusion related to the effectiveness of [internal control over financial reporting]." *Mgmt.'s Report on Internal Control Over Fin. Reporting*, Securities Act Release No. 8762, 2006 WL 3740310 at *21 (Dec. 20, 2006).

deficiency, or a combination of deficiencies, in internal control over financial reporting . . . such that there is a reasonable possibility that a ***material misstatement*** of the registrant's annual or interim financial statements ***will not be prevented or detected on a timely basis***." ¶ 53; 17 C.F.R. § 210.1-2(a)(4).[16]  As stated in GMX's own Offering Materials, "[t]he report by us of a material weakness may cause investors to lose confidence in our consolidated financial statements, and our stock price may be adversely affected as a result." ¶ 44.  Thus, at the time GMX issued the Restatement, it publicly acknowledged materiality.   Although GMX now seeks to argue otherwise, the Company's own characterization of the Restatement as one necessitated by "errors," combined with its concession that there was a "material weakness," is an admission that the false statements and information included in the Offering Materials, and corrected through the Company's subsequent Restatement, would be material to a reasonable investor.

In attempting to explain the cause of the Restatement, Defendants cite to the SEC's October 29, 2009 Staff Accounting Bulletin No. 113 ("SAB No. 113") as the "revised guidance" that revealed GMX had been improperly applying certain methodologies and calculations and thereby prompted the discovery of the "material

---

[16] The current definition of "material weakness" was adopted by the SEC, in part, because the SEC determined that "material weakness" should "describe[] those conditions in [internal control over financial reporting] that, if they exist, ***should be disclosed to investors*** and should preclude a conclusion that [internal control over financial reporting] is effective." *Amendments to Rules Regarding Mgmt.'s Report on Internal Controls Over Fin. Reporting*, Securities Act Release No. 76, 2007 WL 1790874, at *7 (June 27, 2007).

weakness" in the Company's internal control over financial reporting.  GMX Br. at 6-7.
SAB No. 113, however, was intended merely to clarify existing accounting principles
and, to that end, the bulletin states that "[t]he staff expects registrants to apply the
updated guidance in this SAB related to [Oil and Gas Producing Activities] on
*prospective* basis . . . ."  GMX Br. Ex. 2 at 1.  SAB No. 113 in no way mandated a
retrospective application of the revised guidelines to registrants' past financial
statements.  *See generally* GMX Br. Ex. 2.

Any retrospective corrections that the Company carried out following the release
of SAB No. 113, therefore, were necessarily undertaken—as Defendants admit—to
compensate for the erroneous application of then-existing accounting principles and
methodologies in computing "GMX's full cost pool impairment charges, other
impairment charges, and deferred income taxes in the fourth quarter of 2008 and the first
and second quarters of 2009 . . . [and] GMX's diluted loss per share for 2008 and the first
three quarters of 2009."  GMX Br. at 7.  That the Company only discovered it was
incorrectly applying these accounting methodologies upon the publication of the
additional SEC guidance does not relieve Defendants of § 11 liability as even innocent
misstatements can give rise to Section 11 liability.[17]

Furthermore, if GMX was simply seeking to reconcile its financial statements with
the new accounting guidance, a Restatement of the 2008 year-end and 2009 quarterly

---

[17] Defendants state that "Plaintiffs do not allege that any defendant had knowledge of the
errors corrected by the 2010 10-K or that any party acted in anything but good faith."
GMX Br. at 8.  Defendants, however, appear to misapprehend the law as there is no
scienter requirement for § 11 claims.  *See Herman & MacLean*, 459 U.S. at 381–82.

financial statements would not have been necessary.  Pursuant to Statement of Financial Accounting Standards No. 154 ("SFAS No. 154"), a company is not required to undertake a restatement to reflect adjustments due to a change in accounting principles or a change in accounting estimates.  *Accounting Changes and Error Corrections*, Statement of Fin. Accounting Standards No. 154 (Fin. Accounting Standards Bd. 2005). Indeed, SFAS No. 154 explicitly defines "restatement" as "the process of revising previously issued financial statements to reflect the correction of an ***error*** in those financial statements" and provides an alternative mechanism, a "Retrospective Application," through which a company may adjust its financial statements to comport with new accounting principles or guidance without issuing a restatement.  *Id*. at 3; *see also* ¶ 58 (explaining the required disclosures for a change in accounting principles). Indeed, in GMX's 2009 10-K, the Company undertook "[a]djustments due to Adoption of ASC 470−20" which simply adjusted, rather than restated, certain metrics due to the Company's adoption of a new accounting standard.  *See* GMX Br. Ex. 4, F-19, F-20.  By restating the Company's year-end 2008 and quarterly 2009 financial statements, rather than undertaking a retrospective application, GMX conceded that there were material errors in its prior period financial statements.[18]

### B.    The Content of the Restated Financial Statements Further Establishes the Materiality of the Misstatements

Notwithstanding the fact that Defendants opted to restate GMX's financial statements rather than utilize other mechanisms provided for by the applicable accounting

---

[18] SFAS No. 154 states, "[t]he provisions of this Statement ***need not be applied to immaterial items***."  SFAS No. 154 at 11.

standards, and to characterize the corrections undertaken through the Restatement as necessitated by a "*material* weakness" in GMX's internal controls, Defendants now attempt to back away from these characterizations and instead focus on assertions that the content of Defendants' admittedly false and misleading statements was immaterial.  *See generally* GMX Br. at 15-21.   However, Plaintiffs' allegations regarding the content of the Restatement that GMX claims was necessitated by the revised SEC guidance further demonstrate that the Offering Materials contained materially false statements and omitted material information.

### 1.   The Subsequently Corrected Impairment Charges Were Material

Staff Accounting Bulletin No. 99 suggests that one of the many qualitative factors to be considered in a materiality inquiry is "[w]hether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."  SAB No. 99, 64 Fed. Reg. at 45152.  Because GMX is an oil and natural gas exploration and production company, its oil and natural gas properties, which include the subterraneous oil and natural gas reserves underlying these properties, would, "play[] a significant role in the [Company's] operations or profitability."   ¶ 32; SAB No. 99, 64 Fed. Reg. at 45152.   In fact, Defendants state that "GMX's principal asset [is] its oil and gas reserves."   GMX Br. at 7.   Therefore, the level of impairment of this "principal asset" is information that "a reasonable investor would consider . . . important in determining whether to buy or sell stock." *Grossman*, 120 F.3d at 1119.

Through the Restatement, GMX made significant corrections to the impairment charges for its oil and natural gas properties as originally reported in the Company's balance sheet. ¶ 48. The Restatement increased the impairment metric reflected on the Company's balance sheet for the three months ended December 31, 2008 by $41,021,000 and decreased the same impairment figure by $45,650,000 for the three months ended March 31, 2009. *Id*. The corrections represented an increase of 27.0% over the previously reported metric for December 31, 2008 and a decrease of 24.8% of the previously reported metric for March 31, 2009. *Id*. While the magnitude alone of the corrections evinces the materiality of these misstatements,[19] the fact that the metrics were measuring the level of impairment of "GMX's principal asset" further establishes the materiality of these figures.

Defendants assert that "[b]ecause the restatement primarily concerned the issue of whether to take a charge in the fourth quarter of 2008 as opposed to the first quarter of 2009 . . . Plaintiffs do not and cannot allege that this change was material . . . ." GMX Br. at 16-17. However, Defendants misconstrue the law as, "***[m]ateriality is determined in light of the circumstances existing at the time the alleged misstatement occurred***." *Ganino*, 228 F.3d at 165. As the Second Circuit explained, "an overstatement of fourth quarter earnings [is] not rendered immaterial simply because profits for the year as a

_____

[19] As the SEC stated in SAB No. 99, while emphasizing the importance of qualitative factors, "[t]he use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that . . . a deviation of ***less than the specified percentage*** with respect to a particular item on the registrant's financial statements is unlikely to be material." SAB No. 99, 64 Fed. Reg. at 45151; *see also ECA*, 553 F.3d at 204 (stating "the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement").

whole were not affected by the misrepresentation because ***the prospective purchaser was entitled to a full disclosure of all the facts that were known to the Corporation at the time the [financial statement] was issued***." *Id.* Plaintiffs were entitled to accurate and "full disclosure" of the Company's impairment charges when these figures were included in both the May 2009 Offering Materials and the October 2009 Offering Materials, regardless of the relative size of the corrections subsequently applied to each period.

## 2. The Subsequently Removed DTAs Were Material

DTAs arise when a company benefits in future years by offsetting prior tax losses against future taxable income. *See, e.g. In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 377 (S.D.N.Y. 2007) ("Deferred tax assets arise when a company will be able to benefit in future years by offsetting past tax losses against future taxable income."); *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 89 (D.P.R. 2010) (same). However, a company may only maintain a DTA on its balance sheet if it is more likely than not that it will be realized, i.e., that the company will have future taxable income. *See Accounting for Income Taxes*, Statement of Fin. Accounting Standards No. 109 ("SFAS No. 109"), 112 (Fin. Accounting Standards Bd. 1992) ("[a] deferred tax asset is reduced . . . if, based on the weight of evidence available, it is more likely than not that . . . all of a deferred tax asset will not be realized.").[20]

GMX recorded sizable DTAs of $11,519,000 for the year ended December 31, 2008; $62,651,000 for the three months ended March 31, 2009; $56,928,000 for the three

---

[20] In this context, "[m]ore likely than not [is intended to] mean a level of likelihood that is more than 50 percent." *Id*. at 35.

months ended June 30, 2009; and $53,047,000 for the year ended September 30, 2009.

¶¶ 48, 55.  The Company's subsequent Restatement, however, ***completely removed the DTAs initially recorded for each of these periods***.  *Id*.  As discussed in the preceding paragraph, the maintenance of the considerable DTAs reported on the Company's original balance sheet signaled to investors, among other things, that the Company expected to have future taxable income against which to apply the DTAs.   The retrospective removal of the previously recorded DTAs indicated a significant change in the financial prognosis for GMX.  This change in the Company's outlook, as indicated by the corrections to the DTAs, is information "a reasonable investor would consider . . . important in determining whether to buy or sell stock."  *Grossman*, 120 F.3d at 1119.

In addition, this retrospective correction amounted to an admission by the Company that it should not have initially recorded a DTA for these periods.   The principles used to account for income taxes, such as those used to determine a DTA, are to be applied "***at the date of the financial statements***."  SFAS No. 109, at 4.  Therefore, a retrospective adjustment to a DTA would be warranted only if the principles applied to the facts and circumstances as they existed at the date of the financial statements in determining the DTA were improper.  Indeed, SFAS No. 109 nowhere contemplates retrospectively correcting DTAs based on hindsight.[21]  *Id*.  By restating the Company's DTAs for 2008 and the first three quarters of 2009, GMX admitted that the Company's

---

[21] In fact, in discussing the effective date of the newly adopted Statement, SFAS No. 109 states, "[a]pplication of the requirements for recognition of a deferred tax liability or asset for a restated interim or annual period shall be based on the facts and circumstances as they existed at that prior date and without the benefit of hindsight."  SFAS No. 109 at 22.

originally recorded DTAs, which conveyed material information regarding the Company's overall financial well-being to investors, were erroneously reported.

Contrary to Defendants' assertions, the materially false DTAs recorded on GMX's balance sheets were not inactionable statements of opinion, as these flawed figures resulted from "discovered errors" relating to "the method used to record GMX's . . . deferred income taxes in the fourth quarter of 2008 and the first and second quarters of 2009" and *not* from subjective estimates or opinions that later proved false.  GMX Br. at 7.  The fact that the computation of DTAs involves certain estimates[22] does not relieve Defendants of liability for the misstated DTAs, as the determination of a DTA also involves the measurement and consideration of certain objective and verifiable information.  SFAS No. 109 at ¶¶ 17, 20.  Furthermore, if the accounting calculations and methodologies providing the basis for an estimate are improper, the resulting erroneous estimate cannot be said to be a subjective opinion for which the speaker is insulated from liability and is instead an actionable, objectively false statement.[23]  As Plaintiffs have adequately alleged, GMX's erroneously calculated DTAs were actionable misstatements that rendered the figures included in the Offering Materials false and misleading.

---

[22] *See* GMX Br. at 19-20.

[23] *See, e.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 658 (S.D.N.Y. 2012) (rejecting Defendants' proposed application of *Fait* and finding that the challenged valuations were inflated, stating "[h]ere, however, the SAC claims not that GE estimated the value of its assets incorrectly, but that its valuation *must* be false because the company engaged in improper accounting practices. Thus, the truth or falsity of this statement is not a matter of opinion, it is an objective fact and plaintiffs need not plead subjective falsity.") (emphasis in original).

C.    **Material Weakness in Internal Controls**

Plaintiffs have adequately pled the falsity and materiality of Defendants' statements in the Offering Materials regarding the adequacy of GMX's internal controls, as shown by the Company's admission of a "material weakness" in its internal controls over financial reporting. The May 2009 Offering Materials and the October 2009 Offering Materials contained representations that the Company evaluated its internal control systems and did not find any deficiencies. ¶¶ 38, 44. However, as discussed above, the Company's March 2010 10-K revealed that GMX determined that there was a "material weakness" or "a deficiency, or a combination of deficiencies, in internal control over financial reporting" during the periods in which the Offering Materials were issued, such that the Company's financial statements published during that time needed to be restated and the original statements "should no longer be relied upon." ¶¶ 53, 47. This announcement amounted to a concession that the Company's statements reassuring investors about the adequacy of its internal control systems were materially false and misleading.[24]

---

[24] *See In re New Century*, 588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008) (finding that defendants' subsequent disclosure specifically mentioning problems with the company's internal controls as among the reasons for the inaccurate statements in the company's financial reporting "sufficient to support the allegations that [the defendants] made material false and misleading statements regarding the adequacy of internal controls . . . ."); *see also Cent. Laborers' Pension Fund v. SIRVA, Inc.*, No. 04-CV-7644, 2006 WL 2787520, at *9 (N.D. Ill. Sept. 22, 2006) (stating "[b]ecause it is arguable that a reasonable investor would find such information relevant to his investment decision, the section 11 accounting practices claim cannot be dismissed.").

## VII.  DEFENDANTS FAIL TO ESTABLISH A NEGATIVE CAUSATION AFFIRMATIVE DEFENSE

Defendants assert that they are entitled to an affirmative defense.  However, this negative causation argument lacks any factual basis and completely fails to prove that something other than Defendants' material misstatements caused or could have caused Plaintiffs' presumed loss.  Moreover, Defendants' argument ignores the clear statutory language prescribing a measure for Plaintiffs' damages and is based on the incorrect assertion that only loss following a "disclosure" is recoverable.  Accordingly, for the reasons set forth below, Defendants' argument must fail.

### A.  Any Decline in the Value of Shares is Presumed to be Caused by Defendants' Misstatements

To state a claim under §§ 11 and 12, a plaintiff need only allege a materially false and/or misleading statement or omission by defendants.  *United Food*, 2010 WL 3527596, at *4-5.  Because §§ 11 and 12 "impose[] strict liability for misrepresentations contained in a registration statement [or Prospectus], any decline in value is ***presumed*** to be caused by the misrepresentation."  *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 283 (S.D. Tex. 2005) (denying Defendants' negative causation defense at the class certification stage); *In re SemGroup*, 729 F. Supp. 2d at 1305 ("damages are presumed at the pleading stage").  Furthermore, at the "Rule 12(b)(6) stage . . . the Court must draw all reasonable inferences in Plaintiffs' favor."  *In re WRT Energy Sec. Litig.*, 96-CIV-3610, 2005 WL 2088406, at *1 (S.D.N.Y. Aug. 30, 2005) (Plaintiff does not bear the "risk of uncertainty" as to the cause of the decline).

29

Here, Plaintiffs clearly allege material misrepresentations by Defendants in the Offering Materials.  *See, supra,* Section VI herein.  Moreover, though not required, Plaintiffs sufficiently allege that the material misrepresentations concealed the risk that materialized and diminished the market value of GMX's common stock.  ¶¶ 34-35 (May 2009 Offering purchase price), ¶¶ 40-41 (October 2009 Offering purchase price), ¶¶ 47-49 (earnings (loss) per share caused by restatement), ¶ 64 (class allegations of purchase and damage); *see In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (rejecting defendants' negative causation arguments where the risks where concealed from investors).  Accordingly, at the pleading stage, any decline in value is ***presumed*** to be caused by Defendants' misrepresentations in the Offering Materials.

### B.    Defendants Do Not Prove Their Misstatements Did Not Cause the Decline in the Value of Shares

In order to establish a negative causation defense, Defendants must ***prove*** that the presumed loss in the value of the share price is ***due to something other than the misleading statements***.  *United Food*, 2010 WL 3527596, at *6.  Defendants bear the burden of demonstrating the "incorrectness of the presumption" as the statutes relegate the "risk of uncertainty to the defendants." *In re WRT*, 2005 WL 2088406, at *1; *United Food*, 2010 WL 3527596, at *6 (explaining that an "investor's [alleged] failure to show loss causation is not fatal to §§ 11 and 12 claims because he does not bear the burden of proof on loss causation vis-a-vis those claims"); *In re Shoretel, Inc., Sec. Litig.*, C-08-00271, 2009 WL 2588881, at *4 (N.D. Cal. Aug. 19, 2009) (defendants must ***prove*** "that the stock drop resulted from factors other than the alleged misstatement" and the

complaint must foreclose the possibility that defendants' misstatements or omissions caused plaintiffs' losses). Thus, the burden on Defendants is a heavy one that they have failed to satisfy. *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004).

Simply put, this is not a § 10(b) analysis, and thus liability is more readily triggered. *In re Dynegy,* 226 F.R.D. at 271 (liability under these sections against the "issuer of a security is virtually absolute, even for innocent misstatements"). Under §§ 11 and 12, a plaintiff need only allege a material misrepresentation; he is not required to show that the misrepresentation was the "only cause of the stock decline at this stage." *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009) (explaining that the existence of other "possible" causes does not foreclose the possibility that defendants' misrepresentations caused the decline); *see Schaffer v. Evolving Sys., Inc.,* 29 F. Supp. 2d 1213, 1220 (D. Colo. 1998) (plaintiff not required to show the loss suffered ***was direct and proximate cause of misrepresentation or omission*** to survive motion to dismiss).[25]

Defendants have failed to meet their heavy burden to overcome the presumption that their misrepresentations caused the decline in share value. Instead, Defendants rely

---

[25] *See, e.g., In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1169-70 (C.D. Cal. 2008) (holding that plaintiffs "sufficiently allege that their securities suffered a diminution in value" and that "[n]othing on the face of the [Complaint or elsewhere] . . . shows that Plaintiffs cannot have suffered the 'type of injury'—economic loss in connection with the purchase or sale of securities—that the law requires"); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1148 (D.N.M. 2011) (explaining that the [Section 11 and 12] damages scheme "requires a plaintiff to plead only "a ***decline in market value***' to state an appropriate claim for damages").

solely on the "general rule" that a price decline before disclosure cannot be charged to Defendants. *See* GMX Br. at 21-22. This rule, however, "***does not relieve Defendants of their burden of establishing the affirmative defense of negative causation***." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 411 F. Supp. 2d 377, 383 (S.D.N.Y. 2006) (rejecting negative causation defense where defendant failed to rebut the presumption), *compare with Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005) (§ 10(b) liability, on the other hand, requires that any corrective disclosure of alleged misstatements be the cause of the *decline* in stock value that plaintiffs claim as their loss).

Under §§ 11 and 12, a court at the Rule 12(b)(6) stage "must infer that the decline in value was the result of the misstatements, unless the defendant ***offers evidence*** to the contrary." *In re WRT*, 2005 WL 2088406, at *2 (rejecting negative causation defense that a pre-disclosure decline could not have been caused by misrepresentations). Defendants cite to no concrete facts to ***prove*** that something other than the alleged misrepresentations caused the decline in the value of the securities, and therefore fail to meet their burden in establishing a negative causation defense. *See* GMX Br. at 22-23 (wherein Defendants conclude that it is "clear beyond any doubt" and "almost certain" that the admitted stock price decline was "***attributable to factors unrelated to the restatement***" such as "the price of natural gas" and posit that it was "some other unrelated cause"); *In re WRT*, 2005 WL 2088406, at *2 (defendants' defense fails where defendant offers no facts indicating what caused the decline).

Furthermore, Defendants cannot logically argue that there is an absence of loss causation on the face of the Complaint when they admit, at the very least, "the

Company's stock fell" after the announcement of the Restatement.[26]   Accordingly, the

Complaint does not foreclose the viability of Plaintiffs' claim that they suffered a loss.

*See In re SemGroup*, 729 F. Supp. 2d at 1305 (plaintiff adequately alleged a § 11 claim

where plaintiff alleged it suffered losses from purchases made pursuant to offering).  Due

to this admission, and drawing all reasonable inferences in Plaintiffs' favor, Defendants

have not met their heavy burden to establish a negative causation affirmative defense.

### C.   Defendants' Damages Argument is Premature, But Plaintiff is Nonetheless Statutorily Entitled to Recover For Any Decline in Share Value

Putting aside the fact that Defendants have failed to meet their burden in

establishing a negative causation defense, Defendants' premature argument on damages

completely misstates the statutorily mandated damage analysis for §§ 11 and 12 claims.

Defendants argue that Plaintiffs "fail to allege any requisite damages" and "do not allege

that they held their shares on the date of the Announcement."  *See* GMX. Br. at 23.  Loss

causation and damages are, however, "beyond the scope of [12(b)(6) motions], and

extend[] to evidentiary arguments not properly considered at this stage of the litigation."

*United Food,* 2010 WL 3527596, at \*7; *see also In re SemGroup,* 729 F. Supp. 2d at

1305 (damages are *presumed* at the pleading stage); *In re Dynegy,* 226 F.R.D. at 283

(rejecting defendants negative causation defense to limit a putative class at the class

certification stage of litigation in part because assessing individual damages and loss

---

[26] Sections 11 and 12 impose strict liability on Defendants regardless of whether the stock fell 70 cents or 70 dollars.  Defendants' argument is akin to that of a speeding violator who admits to exceeding the speed limit but defends himself by asserting he only broke the law by going one mile per hour over the limit.  Whether it be just one mile per hour or seventy, the violator broke the law.  The same applies here.

requires "reach[ing] the merits"); *In re Shoretel,* 2009 WL 2588881, at *4 (the specifics of plaintiff's ability to establish loss causation and damages are "factual questions that this Court does not resolve on a 12(b)(6) motion").

Similarly, as established in Section VII.A. above, Plaintiffs are not required to hold stock beyond a disclosure date and such ownership is not an element of Plaintiffs' *prima facie* case. *See United Food,* 2010 WL 3527596, at *4-5. How "much damage—if any—plaintiff suffered as a result of the purchases, the actual tracing of the purchases to specific defendants, the applicability of potential affirmative defenses are fact-intensive issues, the resolution of which is not appropriate at this stage." *In re SemGroup*, 729 F. Supp. 2d at 1305. Accordingly, Defendants' arguments regarding damages are premature and should be rejected.

Even if the Court were to address Defendants' damages argument, Defendants again conflate standards by arguing that a decline in share value prior to a disclosure, or in shares sold before the disclosure, is not recoverable. Unlike a § 10(b) claim, however, under § 11, a plaintiff's loss is statutorily calculated as:

> *[T]he difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit* . . . .

15 U.S.C. § 77k(e).

Similarly, under § 12(a)(2), the measure of loss is:

> [T]he **consideration paid for such security with interest thereon, less the amount of any income received thereon**, upon the tender of such security, or for damages if he no longer owns the security.

34

15 U.S.C. § 77*l*.

Plaintiffs have sufficiently alleged that material misstatements in the Offering Materials caused a decline in the share value of GMX common stock and are therefore entitled to recover any decline in the value of their shares. The §§ 11 and 12 damages schemes require a plaintiff to plead only "a *decline in market value*" of shares to state an appropriate claim for damages. *Genesee Cnty.*, 825 F. Supp. 2d at 1148. Where the courts have denied plaintiffs recovery for sales prior to a "disclosure," they have done so because it was clear plaintiff's losses were attributable to *something other than a misstatement*—which is not the case here. *See, e.g., Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 371 (S.D.N.Y. 2010) (dismissing a § 11 claim because plaintiff incurred *all his losses* prior to a disclosure as stock continued to rise after the disclosure); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005) (dismissing a § 11 claim on a negative causation defense *because the alleged misrepresentations occurred after the registration statement was filed*); *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 07 CIV. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) (granting negative causation defense where defendant established *stock traded above offering price after disclosure*); *In re WRT*, 2005 WL 2088406, at *3 (explaining that plaintiff who *sold or purchased above the offering price* cannot recover that difference).[27]

---

[27] Defendants' authority is inapposite. At least one of the cases Defendants cite incorrectly required plaintiff to adhere to a *Dura* § 10(b) pleading standards despite the fact that *Dura* does not address, or mention §§ 11 and 12 claims. *See Davidco Investors, LLC v. Anchor Glass Container Corp.*, 8:04-CV-2561, 2006 WL 547989, at *24-25 (M.D. Fla. Mar. 6, 2006) (ignoring the presumption that Defendants' misrepresentations caused the loss by relying on *Dura*); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

It is undisputed that the price of GMX common stock has not risen above either of the Offering prices.  *See* GMX Br. at Ex. 5.  Defendants have presented no proof that their misrepresentations did not cause the decline, and have failed to provide any evidence that Plaintiffs sold for a profit.  Since Plaintiffs have sufficiently pled the necessary elements of their §§ 11 and 12(a)(2) claims, and Defendants have failed to meet their heavy burden of a proving negative causation affirmative defense, Defendants' arguments must be rejected. [28]

## VIII.  THE UNDERWRITER DEFENDANTS ARE LIABLE

Plaintiffs incorporate by reference the arguments set forth in the foregoing sections to the extent they pertain to the Underwriter Defendants and asserts those arguments with equal force against the Underwriter Defendants.  Notwithstanding those arguments, the Underwriter Defendants' Motion to Dismiss should be equally denied on the separate grounds that they are not entitled to a reliance defense with respect to the

---

346-47, 125 S. Ct. 1627, 1634, 161 L. Ed. 2d 577 (2005) (explaining that under *§ 10(b)*, if the purchaser sells his stock before the relevant truth begins to leak out, the misrepresentation will not have caused his loss); *but see* 15 U.S.C. § 77k(e) ("Provided, That if the defendant proves . . . .").  Two other cases Defendants rely on deal with the dismissal of claims where either the losses were attributed to the market generally or a sale occurred prior to a merger.  *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (plaintiff sold prior a merger); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) (loss attributed to market decline).

[28] As Plaintiffs have adequately pled a primary violation of the securities laws and Defendants do not dispute that they had "'control' over the primary violator," Plaintiffs have established Defendants' liability as controlling persons under § 15.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003).

Unaudited 2009 Quarterly Financial Statements (the "Unaudited Financials") or the Audited 2008 Financial Statements (the "Audited Financials").

### A. The Underwriter Defendants Are Not Permitted to Rely on Unaudited Financials

Defendants are not permitted to assert a reliance defense based on *unaudited* financial statements. *In re WorldCom,* 346 F. Supp. 2d at 677-78 (rejecting underwriter defendant's reliance defense and denying summary judgment). The defense is only available where an underwriter relies on portions of a registration statement and prospectus *prepared or audited by experts*. *See* 15 U.S.C. § 77k(b)(3)(C); *In re WorldCom,* 346 F. Supp. 2d at 662-63 (notably, even then the underwriter must prove it had "no reasonable ground to believe and did not believe . . . that the statements therein were untrue"). Unaudited statements do not constitute "*expertised*" information for purposes of § 11[29] liability, and thus cannot be relied upon by the underwriters in the same manner as expertised, audited financial statements. *Id*. at 677-78.

The Underwriter Defendants effectively ask this Court to ignore the clear and express difference between audited and *unaudited* financial statements because, in their words, "to hold otherwise would create an anomaly." *See* U/W Br. at 14. No such anomaly exists – "[s]ection 11(b) plainly commands that underwriters conduct an *investigation* as to portions of a registration statement *not made on the authority of an expert*." *In re WorldCom,* 346 F. Supp. 2d at 678; *In re Enron Corp. Sec., Derivative &*

---

[29] As the Underwriter Defendants concede, the standard under § 12(a)(2) "is similar, if not identical," to the standard under § 11. U/W Br. at 10 n.6 (citing *In re Software Toolworks. Inc. Sec. Litig.*, 50 F.3d 615, 621 (9th Cir. 1994)). Thus, the reasons for denying dismissal of § 11 claims apply with equal force to § 12(a)(2) claims.

"ERISA" Litig., MDL-1446, 2005 WL 3704688, at *18 (S.D. Tex. Dec. 5, 2005) (underwriter "must demonstrate affirmatively that after conducting a reasonable investigation, that it had a reasonable ground to believe and did believe that the unaudited interim financial data was true").

There is no question or dispute that the 2009 quarterly financial statements were *not* audited by Smith Carney.  As a result, the Underwriter Defendants were required to do more than accept whatever Smith Carney stated as true.  *See In re Worldcom*, 346 F. Supp. 2d at 678.  Despite this requirement, the Underwriter Defendants relied **solely** on the inaccurate legal conclusion that the Unaudited Financials "reflected expertised accounting judgments on which the Underwriter Defendants were entitled to rely."[30]  *See* U/W Br. at 15.  Such blind reliance simply is not permitted because "without a reasonable investigation, of course, it can never be known what would have been uncovered or what additional disclosures would have been demanded."  *In re Worldcom*, 346 F. Supp. 2d at 683-84.

### B.   The Underwriter Defendants Ignored A Red Flag in the Audited Financials

Even where reliance on audited financial statements is generally permitted, that reliance may not be blind.  *In re Worldcom*, 346 F. Supp. 2d at 672; *see, e.g., In re Enron*, 2005 WL 3704688, at *18 (reliance on audited financials is not automatic); *In re Fleming*

---

[30] Notably, the Underwriter Defendants do not contend that they engaged in any form of investigation and have not raised a due diligence defense.  This telling omission is likely a result of the Underwriter Defendants' failure to conduct an investigation into the Unaudited Financials (or Audited Financials upon which they premise their entire reliance).

*Cos. Inc. Sec. & Derivative Litig.*, CIV-A-503-MD-1530, 2004 WL 5278716, at \*45 (E.D. Tex. June 16, 2004) (rejecting underwriter defendants' argument that their entitlement to a reliance defense is clear from the face of the complaint). The underwriter must prove it had "no reasonable ground to believe and did not believe . . . that the statements therein were untrue." *In re WorldCom,* 346 F. Supp. 2d at 662-63. Moreover, where red flags regarding the reliability of audited financial statements emerge, "mere reliance on an audit will not be sufficient to ward off liability." *Id.* at 672; *see also id.* at 679 (the "existence of red flags can create a duty to investigate even audited financial statements."). A red flag is anything that strips a defendant of "his confidence in the accuracy of those portions of a registration statement premised on audited financial statements." *Id.* at 673-74 ("what is at stake under Section 11 [and 12] is not an auditor's scienter, but the accuracy and completeness of the statements in the registration statement").

Here, the mere presence of a significant DTA constituted a red flag regarding the accuracy of the Audited Financials, requiring the Underwriter Defendants, at the very least, to inquire as to the factual basis underlying the decision to maintain this asset on the Company's balance sheet. As discussed above, a DTA may only be maintained on a company's balance sheet when the company expects that it will be realized – *i.e.*, that it will have future taxable income against which to apply the DTA. ¶¶ 61, 63. The fact that the Company was maintaining a DTA of approximately $11.5 million in its Audited

Financials should have raised concerns for the Underwriter Defendants.[31]  Unlike the underwriters in *In re Software Toolworks*, the Underwriter Defendants failed to conduct an investigation into the audited financials when confronted with the sizeable DTA. 50 F.3d at 623-24 (where defendants were confronted with a red flag and appropriately conducted an additional investigation that the court found reasonable).  Instead, the Underwriter Defendants accepted the implicit statement regarding GMX's future profitability as true, without any knowledge and/or proof of the information, circumstances and/or expectations underlying that statement.[32]

## IX.  CONCLUSION

For the reasons stated above, Plaintiffs respectfully submit that Defendants' motions to dismiss should be denied in their entirety.

---

[31] Even prior to restating the financial metrics in Defendant GMX's 2008 Form 10-K, Defendant GMX reported a net income (loss) of $81,713,00 for FY 2008.  ¶ 55.  Putting aside the fact that the net income was in fact a loss, the DTA of nearly $11,500,000 represents almost 15% of that figure.  Put another way, for GMX to realize a profit in FY 2009 against which to apply the DTA, GMX's net income would have needed to increase substantially.

[32] As discussed in more detail above, that GMX retroactively removed the DTAs for the relevant periods establishes that these assets were erroneously recorded.  *See supra* Section VI.  This error and subsequent correction provide further evidence of the Underwriter Defendants' failure to conduct a reasonable investigation regarding this "red flag" DTA.

Dated:  November 15, 2012

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Michael K. Yarnoff*
Michael K. Yarnoff
Margaret E. Onasch
Joshua A. Materese
280 King of Prussia Road
Radnor, PA  19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
*Counsel for Plaintiffs*

**NIX PATTERSON & ROACH, LLP**
Jeffery J. Angelovich, OBA No. 19981
Bradley E. Beckworth, OBA No. 19982
Brad Seidel
Susan Whatley, OBA No. 30960
Lisa Baldwin
205 Linda Drive
Daingerfield, TX  75638
Tel:  (903) 645-7333
Fax:  (903) 645-5389
*Counsel for Plaintiffs*

**NELSON, ROSELIUS, TERRY & MORTON**
Jason E. Roselius, OBA No. 16721
Derrick L. Morton, OBA No. 17934
P. O. Box 138800
Oklahoma City, Oklahoma 73113-8800
Tel: (405) 705-3600
Fax: (405) 705-2573
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Hugh A. Baysinger
Bradley Earl Beckworth
Harvey D. Ellis, Jr.
Joe M. Hampton
Andrew R. Harroz
Kenneth P. Held
Mack J. Morgan, III
Derrick L. Morton
Stephen L. Olson
Amy J. Pierce
Jason E. Roselius
Melanie W. Rughani
L. Mark Walker
Don S. Strong

I hereby certify that on this the 15th day of November, 2012, I served the attached document by U.S. Mail on the following, who are not registered participants of the ECF System:

Adam S. Hakki
Richard F. Schwed
Christopher R. Fenton
SHEARMAN & STERLING
599 Lexington Avenue
New York, NY 10022

*/s/ Michael K. Yarnoff*
Michael K. Yarnoff

42